IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Nathan Marquis LeBaron,            )
            Plaintiff,             )     CIVIL ACTION NO.
                                   )
    vs.                            )     _____
                                   )
Tom Hicks, Marlene Dodge,          )
Aysha Hameed, Dr. Mohamed,         )   **09 CA 11904** NMG
UMass Correctional Medical         )
Program, Dyana Nickl,              )     ORIGINAL COMPLAINT
Terre K. Marshall, Unknown         )
People, Anthony Mendonsa,          )
Thomas E. Dickhaut, Carol Mici,    )     MAGISTRATE JUDGE _Bowler_
Mr. Smith, Ms. Lieberman,          )
Lynn Chernesky, Department         )
Of Corrections, Commonwealth       )
Of Massachusetts, and Harold       )
W. Clarke, Vicki Pineda,           )     JURY TRIAL DEMANDED
            Defendants.            )

## JURISDICTION & VENUE

Plaintiff Nathan Marquis LeBaron brings this action in order to obtain redress for the deprivation and conspiracy to deprive him of his federally protected rights as hereafter alleged, and counts pursuant to federal pendant jurisdiction.

1.      This case arises under the Constitution and Laws of the United States, and thus the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, because this action seeks to redress damages for violations of 42 U.S.C. §§ 1981, 1983, 1985, and 1986.

3.      The matter in controversy exceeds $75,000 and is between citizens of different states, giving the Court jurisdiction

under 28 U.S.C. § 1332.

4.      Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5.      28 U.S.C. §§ 2283 and 2284 as well as Fed.R.Civ.P. Rule 65 authorize Plaintiff's claims for injunctive relief.

6.      The Defendants and the Plaintiff reside here where the events giving rise to this complaint occurred. Thus, venue is properly situated with this Court pursuant to 28 U.S.C. § 1391(b).

7.      The Court has supplemental jurisdiction over each of Plaintiff's state laws claims under 28 U.S.C. § 1367.

PLAINTIFF

8.      Plaintiff Nathan Marquis LeBaron (at all times mentioned in this Complaint as "Nate") is a citizen of the United States currently residing in Massachusetts as a prisoner at Souza-Baranowski Correctional Center (at all times mentioned herein as "SBCC"), P.O. Box 8000, Shirley, MA 01464.

DEFENDANTS

9.      Tom Hicks is a medical doctor at SBCC.

10.      Marlene Dodge is a Health Services Administrator at SBCC.

11.      Aysha Hameed is a medical doctor who worked for UMass at SBCC at all times mentioned in this Complaint.

12.      Dr. Mohamed is a medical doctor at MCI Concord.

13.      UMass Correctional Medical Program is a business.

14.      Dyana Nickl is a medical Grievance and Appeals Coordinator working for UMass.

15.      Terre K. Marshall is Assistant Deputy Commissioner

of Clinical Services at UMass, whose decisions are final for UMass.

    16.    Unknown People are employees working for Sherriff
**Frank** Cousins at  Essex County Jail.

    17.    Anthony Mendonsa is Deputy Superintendent at SBCC.

    18.    Thomas E. Dickhaut is Superintendent at SBCC.

    19.    Carol Mici is Director of Classification for the DOC.

    20.    **Mr.** Smith and Ms. Lieberman work for the SBCC Mailroom.

    21.    Lynn Chernesky is Director of Treatment at SBCC.

    22.    Department of Corrections (DOC) is the governmental
entity under the Commonwealth that is in charge of the prisons.

    23.    Commonwealth is the Sovereign governmental power
created by each individual sovereign political power holder and
is there to uphold rights of individuals and serve the people.

    24.    Harold W. Clarke is the Commissioner responsible for
the overall operation of the DOC, UMass, and each prison.

### NATURE OF THIS CASE

    25.    Ever since Nate has been wrongfully imprisoned, he
has been subjected to a long train of abuses committed by human
rights criminals under color of law with unmitigated tyrannical
gall. In the prison system, the government has become destructive
to law and order. While Nate has patiently suffered for years,
virtually everything he holds sacred has been violated. The facts
upon which Nate's lawsuit is based occurred as a result of malicious,
intentional, reckless, and negligent conduct of the defendants.
Some of the events were a conspiracy to violate Nate for being
born a Mormon fundamentalist. As a consequence, Nate has suffered
extreme violation of his right to proper medical care, religious
freedom, access to courts, and other violations of supreme Law.

-3-

FACTS

26.     Each defendant is sued in his or her official and individual capacity.

27.     Unknown correctional officers placed Nate in the SMU (Special Management Unit) for absolutely no reason and of no fault of his own.

28.     Correctional officers (C/Os) blocked the vents to the SMU cell Nate was placed in, sealed the door, and blocked the window.

29.     C/Os taunted Nate and made hideous faces because of the false criminal charges and news media hype.

30.     Nate was targeted as "son of a notorious cult leader" by the news media for being born as a Mormon fundamentalist.

31.     Nate kicked the door and asked C/Os to turn on the air to the vents, which the C/Os refused to do.

32.     C/Os demanded that Nate cuff up, and Nate refused.

33.     The practice of the C/Os at Essex County was to leave inmates in cuffs and shackles in their cell with no air.

34.     C/Os pepper sprayed Nate, but that was not good enough. C/Os also unbolted Nate's window and emptied cans of poisonous gas into the air, forming white clouds of poison.

35.     After Nate was almost unconscious and was totally helpless and defenseless, C/Os entered Nate's cell and beat him, breaking his ribs and fingers and bursting blood vessels in his eyes until the white of his eyes was blood red.

36.     C/Os strapped Nate into a chair with cuffs behind his back so tight that this crushed his skin and crimped it to his bones. Nate was left in this condition until his hands turned blue and black.

37.     Nate suffered permanent nerve damage to his hands.

38.     C/Os and the nurse left the pepper spray in Nate's scalp and body, which resulted in burns and rashes and sores.

39.     Nate's criminal defense attorney came to visit him and saw his blood hemhorraged eyes and bruises and had Nate moved to Bridgewater State Hospital to get Nate away from the C/Os.

40.     Nate was moved to Bridgewater for the excuse that he was "suicidal" when in fact he was not suicidal at all but instead was afraid of being murdered.

41.     Non-suicidal inmates had been dying of strangulation with bed sheets. The C/Os say they hung themselves.

42.     C/Os threatened to kill Nate if he filed a grievance.

43.     There was an excessive use of force investigation after Nate was moved to Bridgewater.

44.     Nate was given 500 mg of pain medications for his broken fingers and broken ribs.

45.     Nate was sent back to the jail after thirty days, but the jail psychologist sent Nate back to Bridgewater for another thirty day evaluation.

46.     After Nate was finally put back at the jail, there was ongoing retaliation against Nate for the excessive use of force investigation. This went on for sixteen months.

47.     C/Os sent inmates to attack Nate in his cell in the SMU, but there were no reports of "fights" because the C/Os were the ones doing it. Nate was similarly set up in holding tanks on court dates, but the "fights" were not recorded.

48.     C/Os put a Guatemalan inmate in Nate's cell who spoke no English at all, and told the inmate Nate was an evil person.

-5-

49.     The Guatemalan inmate attacked Nate, dragging him off of the top bunk by his feet, and started punching Nate. Nate wrestled with the aggressor for a long time but did not harm him and only stopped him from punching him. When he got tired, the aggressor left to go bang on the door for the C/O to let him out.

50.     Nate was taken to the SMU and cited for "fighting."

51.     Nate never fought, but had no choice but to defend himself for his physical safety from attacks as is his lawful right.

52.     The Guatemalan gave Nate no chance, since Nate did not know his language to communicate about anything to stop the attack.

53.     The Guatemalan admitted to the Lieutenant at the disciplinary hearing that he attacked Nate, for the excuse that Nate had allegedly "disrespected his food."

54.     Nate was sentenced for "fighting" and received ten days in SMU, but was made to serve a month.

55.     Nate was placed in a cell in the SMU (Special Management Unit) with a toilet overflowing and literally backed up to the brim with feces. Nate lived in this horrible cell with inmate Franklin Kanke, who was in the SMU for cutting an inmate's throat with a razor.

56.     While in the SMU, Nate developed a serious urinary tract infection from using the toilet. This UTI (urinary tract infection) has never gone away since.

57.     All of Nate's sick slips were either ignored or discarded and Nate received no treatment for his UTI until the disease was imbedded deep in his urethral lining.

-6-

58.     No matter how much Nate complained of the burning
pain, he has not received proper treatment from the defendants.

59.     Nate complained to Dr. Mohamed at MCI Concord for
many months, with no relief or remedy, and all for naught. Dr.
Mohamed was deliberately indifferent to Nate's serious medical
need.

60.     Nate complained to Dr. Enow of the UTI that had
developed into a painful tri-colored disease, and Dr. Enow had
prescribed histo-freeze treatments which are designed for venereal
warts, even though Nate has no warts.

61.     Dr. Hameed took Nate off of histofreeze treatment
which was slowing down the painful disease. On 2/22/09 Nate filed
a grievance against Dr. Hameed for providing no treatment while
Nate suffered burning, piercing pain.

62.     On Sunday, 3/8/09 Nate wrote to Dr. Hameed threatening
to sue for his physical suffering of burning pain that might render
him sterile.

63.     On 4/16/09 Russell Phelps answered Nate's 2/22/09
grievance by reinstating histofreeze treatments.

64.     On 4/18/09 Nate filed a grievance against Mr. Phelps
for falsely characterizing his illness as "venereal warts," since
warts do not cause burning pain as Nate is experiencing.

65.     On 5/17/09 Nate filed a grievance complaining he was
only getting histofreeze treatments once a month if he is lucky
and requested a special diet to help his body defeat the illness
naturally.

66.     On 5/24/09 Nate filed a grievance against Dr. Tom
Hicks for removing him from histofreeze treatment due to the fact

that Nate actually has no warts.

67. Dr. Hicks admitted Nate has a speckled black, blue, red, and pink disease, but characterized this as merely "a clot of blood vessels."

68. Dr. Hicks ordered a urinary analysis even though this has already been done numerous times, and Dr. Hicks failed to even follow through.

69. Histofreeze treatments had slowed down the disease and the pain and cured part of one side of the disease, which is now far inside the urethral lining, and does not touch urine.

70. On Wednesday, 6/24/09 Nate wrote Dr. Hicks a letter informing him he was suffering burning pain in his entire groin area.

71. On Tuesday, July 7, 2009 Nate wrote a letter to Dr. Hicks demanding a biopsy for the bloodshot vericose veins and circulatory failure, a tumor Nate had developed, and the fact that Nate lost twenty pounds. Nate described gripping pain and numbness.

72. On 7/11/09 Nate filed a non-medical grievance asking Mr. Dickhaut to intervene due to medical malpractice of Dr. Hicks.

73. On 7/30/09 Nate filed a medical grievance complaining of medical co-payments when he is receiving no care at all.

74. On 8/12/09 Nate received a letter from Terre Marshall for his second level medical grievance appeal indicating Nate was accused of being "very non-compliant with recommendations and treatment plans" such as alleged ultrasound and outside appointments. Nate has literally been given no treatment at all no matter what.

75. On 8/24/09 Nate filed another grievance that he feels worse and numb and is still losing weight even though others are giving him alot of extra food. Nate requested testing of the infection and drugs to kill the specific pathogen.

76. On 7/30/09 Nate filed a grievance indicating he is still receiving no treatment or testing, is getting sick with headaches, is cold no matter how bundled up, the burning pain is worse, and blood vessels are being burst by the pathogen, and he has to sweat alot to raise his temperature up to fight the illness which makes him hungry and he is losing weight. Nate requested testing, medications, and double meals, and to see a urologist and reproductive specialist.

77. On 7/26/09 Nate filed a grievance describing numbness and tingling and cut off circulation and requested resumption of histofreeze treatments, and biopsy testing.

78. On 8/24/09 Nate filed five grievance appeals for the total denial of any kind of medical treatment, the urine test being "lost," risk of losing procreative functions, the lie about alleged ultrasound for the tumor, and Nate collapsed with a fever and had to sleep many hours during the day and woke soaked in his sweat. Nate requested testing, biopsy, to fire defendants Hicks and Dodge, and to be moved away from them.

79. Ms. Dodge wrote Nate in response to his 5/29/09 grievance on 5/29/09 saying the tri-colored area was determined to be "a benign condition" and there were no penile warts to treat.

80. On 7/16/09 Nate filed a grievance against Marlene Dodge for lying to the IPS (Inner Perimeter Security) Lieutenant

-9-

by her saying Nate had threatened Dr. Hicks phsyically. Nate demanded
an apology since all Nate did was threaten to sue him for lying
and saying Nate's pain is not real and the disease is "benign."
Nate requested immediate transfer away from defendants Dodge and
Hicks.

81.    On Sunday, 7/19/09 Nate wrote to Nurse Practitioner
Angela complaining about Dr. Hicks'denial of all treatment and
describing his symptoms, and the tumor he developed in his face,
and lack of reproductive functioning and fear of being rendered
sterile by the disease. Nate continued to suffer and had to wear
a coat, two hats, a blanket and a sheet at night to raise his
temperature to fight the illness, which he fears might become
cancerous if it has not already.

82.    On 7/23/09 Nate filed two more medical grievances
about the denial of all medical treatment amounting to physical
torture and callous disregard for Nate's reproductive health.

83.    On 8/21/09 Dyana Nickl responded to Nate's appeal
of 6/06/09 to his grievance of 5/29/09 saying "The appeal contains
foul, abusive, or threatening language" and "There is no presence
of warts." Nickl refused to help Nate at all.

84.    On 8/12/09 Terre Marshall wrote to MCLS Paralegal Al
Troisi telling him Nate "refused the ultrasound" and they will
"continue to monitor Mr. LeBaron and adjust his treatment plan
based on clinical judgment."

85.    On 3/25/09 Nate filed a grievance against Dr. Hameed
for denial of treatment when he is suffering and still experiencing
burning pain. Nate complained he is being tortured by a Hindu doctor
who thinks pain and suffering are not real.

-10-

86.     On 4/28/09 Russell Phelps responded to Nate's formal
grievance of 4/28/09. Phelps insisted "There is no indication of
a urinary tract infection" even when there was no testing done.

87.     On 6/24/09 Nate wrote an angry letter to Dr. Hicks
complaining that the tri-colored disease Hicks determined was
"benign" was causing Nate to suffer severe burning pain. Nate
accused Dr. Hicks of torturing him in order to save money for the
20 million UMass lost in order to get the DOC contract back. Nate
called Dr. Hicks a "sadistic medical mercenary."

88.     On 6/24/09 Nate filed a regular grievance in attempt
to access his medical records that are being withheld from him
after repeated requests and signed releases. Nate demanded money
damages for long delays in getting the records.

89.     On 8/04/09 CPO I grievance officer Pamela O'Dell
partially approved Nate's 6/24/09 grievance but noted HSU claimed
they received no requests for medical records from Nate.

90.     On 7/29/09 MCLS (Massachusetts Correctional Legal
Services) Paralegal Amelia M. Alex wrote to Nate saying, "As soon
as we receive your medical records, Paralegal Al Troisi will
contact you.

91.     Nate has not received any medical records to date,
although he filled out all the paperwork many times and has MCLS
paralegals as his witness since they received the papers.

92.     On 8/05/09 Dr. Hicks called Nate into his examining
office or HSU room to tell Nate he sees nothing wrong and that the
disease he has is "normal." Dr. Hicks said this without looking
at the diseased area. When pressed, Dr. Hicks agreed to look at
it again, whereupon he quickly pronounced the diseased area to be

"a blood vessel." Dr. Hicks also used the appointment to falsely accuse Nate of "refusing a urine test."

93.     On 8/09/09 Nate filed a grievance against Dr. Hicks for calling him into the HSU room to mock, antagonize, harrass, and provoke Nate. Nate demanded to see proof that Dr. Hicks' medical license is valid and for an investigation to be done on him. Nate further requested a biopsy conducted by an outside specialist and proper medication to treat the disease. Nate further requested a medical diet and a transfer away from Dr. Hicks and a million dollars in damages.

94.     On Monday, 7/06/09 Nate was given a cup with a lid in a plastic bag and asked to provide a urine specimen. Nate complied, but the specimen was "lost" and Dr. Hicks began his false accusations that Nate was refusing treatment.

95.     On August 10, 2009 MCLS Paralegal wrote to Ms. Marshall and Mr. Groblewski on Nate's behalf concerning burning pain and a tumor and Nate's fear that this might lead to permanent damage to his reproductive health. Mr. Troisi included medical release forms signed by Nate, but to date Nate has not received any records.

96.     On 8/24/09 Terre Marshall wrote to Nate urging him to "comply with recommended treatment plans that are being offered in order for you to benefit from the services that are being offered to you." No services were being offered to Nate at all of any kind.

97.     On 8/26/09 Nate wrote to Terre Marshall enclosing his many grievances in a packet and complained of the denial and total refusal to even answer the grievances. Nate begged for medical treatment and complained that defendants Hicks and Dodge were lying to Marshall.

-12-

98.     On 9/04/09 Nate filed a medical grievance complaining that his medical grievances were not being answered. Nate mentioned his grievance about Dr. Hicks calling him into the HSU room to harrass him about his disease being a "blood vessel." Nate demanded an answer to all of his medical grievances and for monetary damages for the attempts to prevent him from exhausting the PLRA administrative remedies requirements.

99.     The defendants at SBCC and their underlings began to harrass Nate when Nate signed up for"sick call." They would arrange this harrassment by placing Nate on the "sick call" appointment list and then not showing up. If Nate is on "sick call," the C/Os will not allow Nate to go to other important functions.

100.    On 9/01/09 Nate missed yard exercise due to sick call and a nurse no-show deliberately orchestrated against Nate.

101.    On 9/02/09 Nate was forced to miss his only weekly chance for law library copies and supplies due to sick call no-show.

102.    On Thursday, 9/3/09 Nate missed Jehovah's Witness Bible study he normally attends. This was specifically scheduled in the afternoon to conflict with Nate's schedule and was no mere accident. The defendants know Nate's schedule on the H1 block.

103.    All of the sick calls three days in a row and their no-shows were specifically planned and scheduled by the defendants to conflict with Nate's schedule.

104.    On 9/04/09 Nate was forced to miss the only weekly weight room and the nurse finally showed up only to say she can't feel the tumor in Nate's face and said to stop picking the sore on Nate's face that never heals, even though Nate never picks at it.

105.    On 9/04/09 Nate filed a grievance against the defendants for interference with his exercise, his health and safety, his legal work, and his religious functions. These things are the most sacred in life, and the defendants deliberately orchestrated this pattern of malicious interference in order to discourage Nate from getting medical attention for his serious medical issues.

106.    On Tuesday, 9/08/09 Nate wrote to Terre Marshall begging to be made whole again and offered to sign a waiver with full agreement not to sue anyone as long as he is healed of this disease. Nate explained he did not want to transfer any disease to his future wife and that this disease violates his religion and is superior to money considerations. Nate assured Ms. Marshall he has no permanent hostilities towards anyone and will not hold a grudge but is tired of suffering all of the time and just wants to be made whole.

107.    It is not Nate's fault that he was subjected to the unsanitary conditions that caused his disease.

108.    On 9/11/09 Terre Marshall wrote Nate a response to his 8/24/09 and 8/31/09 grievance appeals and his 9/08/09 letter. Ms. Marshall informed Nate that there was no Ultrasound and apologized and said Nate was accused of refusing alleged urinalysis tests. She further said, "It is important that you comply with the recommended treatment plans being offered by UMCH providers in order for you to benefit from the services that are being offered." Nate still was not offered any treatment of any kind, nor was he in any way denying any treatment or failing to comply.

109.    Nate continued to demand a biopsy to determine what kind of pathogen was infecting him causing the tri-colored illness.

110.    Nate insisted Dr. Hicks does not have x-ray vision,
is not Superman, nor does he have ESP to be telling Nate he is
not in pain.

111.    Nate's position is that a spotted three-colored
disease causing him extreme burning pain is not merely a "blood
vessel" as Dr. Hicks insists. Dr. Hicks is being exceedingly
disingenuous and unprofessional, to put it nicely.

112.    The defendants will not know what pathogen is infecting
Nate's body unless they conduct a biopsy and send it to a lab to
be tested scientifically.

113.    Dr. Hicks is acting like a pathological liar instead
of a real medical doctor. It is difficult to imagine how Dr. Hicks
determined Nate's disease was "blood vessels" and "benign." Nate
asked Dr. Hicks if he did this by "Superman instincts" or witch
doctor methods rather than going by the scientific method.

114.    Nate had waited patiently for the urine test, which
was finally taken on Monday, 7/06/09, but was "lost" and Dr. Hicks
then accused Nate of "refusing" this test. Nate had been the one
insisting on testing the whole time.

115.    Dr. Mohamed and others had already conducted many
urine tests on Nate, over and over like delusional shizophrenics
repeating the same test and expecting different results. Nate
asked Dr. Hicks what yet another urine test would accomplish in
determining the question of what pathogen is infecting Nate. Dr.
Hicks could save time by reading all previous negative test results.
Nate asked Dr. Hicks if past urine tests had ruled anything out
for test purposes according to the scientific method, and if this
repeating of the same test over and over might be the definition

-15-

of insanity.

116.    Nate described the procedure of conducting a biopsy to Dr. Hicks, which is to remove some of the diseased tissue in a needle and submit it to a lab to identify which particular microorganism is causing the pathology.

117.    Nate asked Dr. Hicks if he knows Nate is suffering chronic burning pain, has lost twenty pounds, and developed a tumor that might be cancerous. Nate futher asked Dr. Hicks if he is aware Nate's testicles are clumped with vericose veins and are blodshot, and that circulatory failure renders him numb with burning pain like a pair of Vise Grips® is attached to each of his testicles. Nate asked Dr. Hicks whether or not that sounds, in his expert opinion, like a "benign" condition. Nate asked Dr. Hicks if he would consider it "benign" if he suffered like this for two years.

118.    Nate asked Dr. Hicks if the cost comparison of a plastic cup and a set of dip sticks for a urinalysis test against the hundreds of dollars for a biopsy and lab tests was the real influence on his medical decisions. Nate asked Dr. Hicks if he thinks Nate is not aware of UMass' twenty million dollar loss, and whether he experiences any pangs of conscience when he maliciously denies people medical treatment in exchange for his paycheck.

119.    Nate asked Dr. Hicks if his medical license is real and if he could see it, what school he attended, and whether he cheated his way through some insolvent medical school overseas.

120.    Nate's illness is so obvious that even a layperson would easily recognize his need for proper medical testing and

· treatment with the proper medications.

121.    A month is not a reasonable timeframe to conduct a
urinalysis test, even if Dr. Hicks intended to do that instead of
a biopsy. And Dr. Hicks threw away the urine and accused Nate of
refusing the test.

122.    Nate repeatedly informed Dr. Hicks and the defendants
that he is greatly suffering, and all of the defendants who were
aware of this allowed Nate's condition to deteriorate into worse
and worse burning pain.

123.    The defendants have disregarded Nate's health and
wellbeing by their deliberate indifference to his serious medical
need for testing and treatment.

124.    The defendants have consciously chosen to put Nate
at excessive risks for permanent, irreparable harm and irreversible
damage, risk of becoming sterile, and unable to have children.

125.    The conduct of the defendants would alert any normal
and reasonable person to the likelihood of liability for this harm
and suffering Nate is forced to endure.

126.    Any reasonable doctor would know that intentional
denial of access to proper medical care and deliberate indifference
to a serious, urgent medical condition is misconduct that would
subject them to personal liability.

127.    Nate has communicated very, very clearly with each
defendant, has written numerous letters and has filed numerous
grievances.

·    128.    The defendants took Nate off of all treatment and
denied all treatment and testing.

129.    The actions of the defendants caused Nate to suffer

-17-

extreme chronic pain, burning, and emotional and physical distress.

130.    It appears that it is the will and intent of each of the defendants involved in this to cause Nate to continue to suffer.

131.    The medical doctor defendants have no valid excuse. Their conduct has been extreme and inexcusable. Their actions are a classic case of deliberate indifference to Nate's serious medical need, and this set of facts in this Complaint also constitute intentional infliction of emotional distress under Massachusetts law. No reasonable person could be expected to endure this abuse and cruel and unusual punishment.

132.    Nate told Dr. Hicks he did not wish to sue him, did not want to become involved in a lawsuit against anyone from prison, he would be out of prison soon, and all he wants is to be made whole and be healed of this disease. Nate asked Dr. Hicks nicely, as a gentleman, for proper medical treatment, and Dr. Hicks chose to play dirty games, to torture Nate and make him suffer, and to deny proper medical treatment.

133.    It would seem obvious to any unbiased, nuetral, and detached member of the public that the UMass defendants in this suit are misdiagnosing Nate and inventing whatever story would sound best in order to claim Nate is not suffering disease that causes him pain and chronic suffering.

134.    Histofreeze treatment is not even the right treatment for whatever Nate has, but it was better than no treatment at all.

135.    Because of the false histofreeze treatment, Russell Phelps made up a story that Nate had a wart in order to cover up the mistreatment for an unknown disease for which defendants utterly refuse to use the scientific method to discover what it really is.

-18-

136.    On 4/28/09, Mr. Phelps wrote to Nate saying, "The M.D. has determined that you indeed have a wart on your penis. There is no indication of a urinary tract infection."

137.    On 5/29/09 Marlene Dodge accused Nate of requesting treatment for penile warts when Nate requested histofreeze for the mysterious disease. Defendant Dodge wrote, "You were examined by the Physician and none were found to treat. You were also examined for a tri-colored area which was determined to be a benign condition."

138.    The defendants are denying Nate treatment and making up whatever story they want in order to sound good on paper, even when no scientific tests have been conducted beyond the urine tests.

139.    Nate complained of a tumor that has developed in his face, and the defendants tried to cover their tracks by claiming to order an Ultrasound test which was never real in the first place but was only made up ad hock to sound good on paper. After the nurse claimed she could not feel the tumor, the defendants recanted the false and made-up Ultrasound, which they alleged Nate refused.

140.    The defendants are denying Nate of any objective testing to find out what Nate's disease is according to the scientific method and are using their "clinical judgement" to hide behind.

141.    Any layman or judge can clearly see the defendants are not testing Nate according to the scientific method and are acting like mere charlatans and quacks to abuse Nate.

142.    The failure  of the defendants to reasonably test Nate's disease is subject to reasonable judicial scrutiny in that it is obvious they do not have superhuman powers.

143.     Nate should not have been at SBCC in the first place but was put there because of the accusation that Nate had been involved in a "fight" combined with the fraudulent classification system of Carol Mici and the defendants.

144.     Nate filed a grievance at Concord accompanied by an affidavit on October 1, 2007, and Kristie Ladouceur responded on 11/19/09.

145.     On 5/17/08 Nate appealed grievance #33835, which was his attempt to get the "fight" and "violence" accusations off of his record which was keeping him in maximum security where all of his rights were being violated.

146.     Nate has been discriminated against by the defendants because of highly unfavorable criminal charges which Nate is about to overturn due to the findings of forensic medical science and laboratory tests.

147.     The defendants have abused Nate out of a hate-based religious discrimination, because Nate was born Mormon fundamentalist.

148.     The defendants have profiled Nate and singled him out for abuseful indivious discriminatory animus and deprivation of all rights.

149.     Mormon fundamentalists are a class of people who have been victims of historically pervasive discrimination and abuse from our society because of their political and religious beliefs.

150.     Mormons are a group of people classed as a religious group, and Mormon fundamentalists are a class of religious people who are the object of discriminatory animus which protects Nate .within the ambit of Title 42 Section 1985 conspiracies.

-20-

151.    The defendants specifically intended to discriminate against Nate based on class, gender, and religion, and they have conspired for the specific purpose of intentionally depriving him of Constitutional rights and have purposefully defeated the due course of justice and denied Due Process.

150.    Through the use of impermissible tactics and malicious, improper, and unconstitutional practices, the defendants have now denied Nate of virtually every right he holds sacred in his life.

151.    On 6/25/08, Defendants Dickhaut and Ladouceur denied Nate's grievance to remove the false "fight" allegation from his record and found that the issue "pertains to a classification matter and is therefore non-grievable in accordance to 103 CMR 491." They further forwarded  the issue to Defendant Mici to be reviewed.

152.    Kristie Ladouceur's decision above was entered onto Nate's grievance appeal on 9/30/08.

153.    Defendant Mici had an illegal classification system in place that abused Nate by charging him seven points for the same conviction as the current conviction and the category of "severity of convictions within the last 7 years." This was used to add seven more points to Nate's score and illegally keep him at maximum security when this was not warranted  by their "Objective Classification Operation Manual" procedures. This illegal method was used to abuse Nate and deny him of Due Process rights.

154.    On September 10, 2008 Carol Mici finally changed her illegal system and removed the seven points off of Nate's score, but then she still kept Nate at maximum security prison when Nate never belonged there in the first place.

-21-

155.    The illegal classification to maximum security prison affects Nate's record. Other public servants and government agencies will look at these records and this will violate Nate by painting a false picture of him as a bad or violent and dangerous person.

156.    The false fight record and the illegal classification will affect Nate's fight for his parental rights in the future, and will thus violate family autonomy and the 9th Amendment.

157.    On 9/11/2008 Nate wrote to Thomas Dickhaut, Superintendent, requesting an early classification hearing, which was then held on 10/20/2008, and yet Nate is still at SBCC now today.

158.    The defendants just put Nate wherever they want and do not abide by their own systemic rules and policies, which affects Nate adversely in many areas of his rights, and not just the issue of which prison he is in.

159.    Nate wrote undated letters to Carol Mici and Kristie Ladouceur regarding his request to investigate the actual D-Report findings proving Nate was attacked and the attacker admitted to this, and therefore it was not a "fight" or "violence" on Nate's part but was only lawful self-defense entitling Nate to have this "fight" taken off of his record.

160.    Carol Mici responded to Nate's many letters by merely obtaining a copy of the Disciplinary ticket itself and not the final findings after the hearing. This was the equivalent of ruling on merely the complaint in an action without any objective adjudication of proven facts. This denied Nate of Due Process.

161.    Nate wrote to Kristi Ladouceur requesting that Carol Mici or somebody investigate the underlying facts and remove the "fight" and the three points off of his record.

162.    On 10/31/08 Ms. Mici concluded from the complaint and not the actual findings that Nate was guilty of fighting and that there was "no indication of self-defense as you claim." Ms. Mici repeated this on 12/22/08 in response to another letter from Nate dated 11/16/08. This again was based on ignorance of the facts and utter refusal to get the findings of the Lieutenant, wherein the attacker admitted to the facts.

163.    Nate wrote to Ms. Ladouceur on 1/02/09 and she gave a response on 1/05/09 closing the matter based on Ms. Mici's reports based on the ignorance and only the complaint itself.

164.    On 1/13/2009 Nate filed a grievance for the failure to investigate the fact that the attacker aggressed as documented by the Lieutenant and requested to have the "fight" removed pursuant to 14th Amendment Due Process rights. CPO I Pamela O'Dell found the grievance non-grievable on 1/21/09.

165.    On 1/26/09 Nate appealed the matter about the "fight" to Mr. Dickhaut based on the posture of the record of "fighting" threatening to undermine Due Process in his parental rights competition before the Supreme Court of the State of Washington. Nate was scheduled to be heard by a Department of the Court pro-se. Being at maximum security prison made him look very bad.

166.    On 10/20/2008 Nate was classed by a 3-0 vote to MCI Norfork and was approved for MCI Norfork by the Commissioner on 5/10/2009, and yet Nate is still at SBCC. Nate has received notice of another class board, which is not supposed to happen since he should not even be at SBCC still. This is extreme.

167.    At SBCC Lynn Chernesky has violated Nate's religious freedom by refusal of his religious practices and musical instruments.